### G. C. Riordan & Company v. Thornsbury, et al.

(Decided December 11, 1917.)

### Appeal from Pike Circuit Court.

1. Bills and Notes—Negotiable Instruments Act—Construction.—As between the original parties to a negotiable instrument, the provisions of the negotiable instruments act declare the prima facie effect of the instrument; as between a holder in due course and prior parties, the effect of the act is absolute.

2. Bills and Notes—Negotiable Instruments Act—Defenses.—Where the maker of a negotiable promissory note added to his signature thereon the word "trustee," without disclosing his principal, he is, under section 20, negotiable instruments act, prima facie liable thereon to the original payee or to one not a holder thereof in due course; and in an action thereon by such party, he may interpose any defense permissible under section 58 of the act.

3. Bills and Notes—Ambiguity—Extrinsic Evidence.—The signature to such note is ambiguous, and in an action thereon by one not a holder in due course, extrinsic evidence is admissible to show whether the signer, in executing the note, intended to bind himself individually or another for whom he was acting in a representative capacity.

4. Bills and Notes—Defenses—Mistake—Trial—Weight of Evidence.—Where, in an action on such note, the defense was that the note was executed for a church, of which defendants were trustees, but that by mistake in the draft of the note, it failed to disclose the true principal, evidence held to support the finding of the chancellor that the note was the obligation of the church, and that by mutual mistake of the parties such principal was not disclosed in the note as was intended by the parties when the note was executed and delivered.

5. Bills and Notes—Finding of Chancellor—Effect.—In such action the recital by the chancellor in his finding that from the facts and circumstances enumerated by him, "plaintiffs should not recover against defendants anything" is in effect a holding that the mistake was mutual.

HARRY B. MACKOY, MACKOY & MACKOY and AUXIER, HARMAN & FRANCIS for appellants.

STRATTON & STEPHENSON for appellees.

OPINION OF THE COURT BY JUDGE CLARKE—Affirming.

The First Methodist Episcopal Church, of Pikeville, Kentucky, was building a new church edifice during the years 1912 and 1913, when and for some time thereafter, J. A. Lewis was its pastor. On January 8, 1913, the appellants, partners doing business under the firm name of G. C. Riordan & Company, sold to the church, through its pastor, the glass for its windows, including several memorial windows, for which payment was to be made in cash. The account was not paid when due, and about February 10, 1913, a note for the amount of the account, due in thirty days, was executed and delivered to G. C. Riordan & Company. This note was not paid when due, and a renewal note, due in sixty days thereafter, was executed and delivered. Neither of these notes is in the record, and there is some doubt as to whether they showed upon their face that they were the notes of the church, or of the trustees as individuals. However, for this same indebtedness, another renewal note was executed, which is as follows:

"$572.00.          Pikeville, Ky., July 1st, 1913.

"Four months after date we promise to pay to the order of G. C. Riordan & Co., five hundred and seventy-two dollars, at First National Bank, Pikeville, Kentucky, with 6% interest. Value received.

"J. K. THORNSBURY,
             Trustee,
"H. S. DAMRON,
             Trustee,
"P. B. STRATTON,
             Trustee,
"R. O. HONAKER,
             Trustee,
"G. S. THORNSBURY,
             Trustee."

This note not having been paid at its maturity, the payee filed this action on October 27, 1914, against J. K. Thornsbury and others who signed the note, seeking judgment against them personally for the amount of the note, with interest and costs. The defendants answered denying individual liability and alleging that, at the time the note was executed, they were trustees of the church; that, as such, they signed and delivered the note to plaintiffs; that the debt for which the note was given was the debt of the church; and that the note was in-

tended by them and accepted by plaintiffs as the note of the church and not as their individual obligation, and by oversight and mistake it was written "we promise to pay" instead of "the church promises to pay."

Plaintiffs filed a reply denying the material allegations of the answer as to the mistake in the execution of the note, and pleaded that the mistake, if any, was upon the part of the defendants only and due to their negligence, and that the mistake was not mutual. The affirmative allegations of the reply were traversed by rejoinder. Several other pleadings were filed by the parties, but as they do not materially change the issues as indicated, they need not be referred to. .

The issues thus presented were, by consent, tried by the court without the intervention of a jury. Judgment was rendered in favor of the defendants and dismissing the petition; and from that judgment this appeal is prosecuted.

1. For reversal, counsel for appellants rely upon section 20 of the Negotiable Instruments Act, which reads as follows:

"Where the instrument contains, or a person adds to his signature, words indicating that he signs for or on behalf of the principal, or in a representative capacity, he is not liable on the instrument if he was duly authorized; but the mere addition of words describing him as agent, or as filling a representative character without disclosing his principal, does not exempt him from personal liability."

It is insisted that, as the Negotiable Instruments Act covers the entire subject of negotiable instruments and is a complete body of law upon that subject, controlling in all cases to which it is applicable, as has been held by this court in Wettlaufer v. Baxter, 137 Ky. 362; First State Bank of Nortonsville v. Williams, 164 Ky. 143; Southern National Life Realty Corporation v. Peoples Bank of Bardstown, 178 Ky. 80, and as section 20 expressly provides that the mere addition of words describing the maker as an agent, of filling a representative character without disclosing his principal, does not exempt him from personal liability, the defendants, having merely added the word "trustee" to their signatures without disclosing their principal, are liable.

The note sued on is, by its terms, a negotiable instrument, and the act does apply whether or not the note was, in fact, negotiated, as was held in Wettlaufer v.

Baxter, *supra;* and, although the act does unquestionably apply to all negotiable instruments, whether actually negotiated or not, it just as certainly does not apply, with equal force, to negotiable instruments that have been issued but not negotiated and to such as have been negotiated. In the two very recent cases of First National Bank of Central City v. Utterback, 177 Ky. 76, and Southern National Life Realty Corporation v. Peoples Bank of Bardstown, *supra,* it was held that the act rendered negotiable paper, after negotiation, free from all defenses available to prior parties among themselves, and at the same time reserves to the maker all defenses against the original payee or a holder, other than a holder in due course. The effect of this holding is that, as among the original parties to the instrument, the provisions of the act simply declare the *prima facie* effect of the instrument; whereas, in the hands of a holder in due course, the declared legal effect is against prior parties absolute. While section 20 of the act provides that a maker, who signs a negotiable instrument such as the note sued on, as did appellees, who added to their signatures the word "trustee" without disclosing their principal, is, by the terms of the instrument, personally liable thereon; yet, nevertheless, this declaration of the act, as between the original parties to the instrument, is but a declaration of *prima facie* liability, which becomes absolute only after negotiation and in the hands of a holder in due course. Clearly, therefore, as the note had not been negotiated and appellants are not holders in due course but are original parties, section 20 of the act is simply declaratory of the *prima facie* liability of appellees on the face of the instrument; and they had the right, as against appellants, to interpose any defense allowable against a negotiable instrument under section 58 of the act.

Formerly, there was much confusion in the decisions as to whether or not extrinsic evidence is admissible to show the intention of the parties in signing such an instrument. In many jurisdictions, it was held that such evidence is not admissible; although in this state, for a long time if not always, it has been the rule that the inquiry to ascertain the proper intention of the parties was not confined to what appeared in the instrument itself, but that resort might be had to extrinsic evidence by the payee or the maker. Pack v. White, 78 Ky. 243; Warford v. Temple, 24 Rep. 2268.

In Newman's Pleading, Practice and Forms, 3rd ed., section 160b, it is said:

"If such a note be signed by one who adds to his signature the words 'as administrator' or 'executor,' this addition is but *descriptio personae,* and the writing is *prima facie* his individual obligation."

In 3 R. C. L., page 1095, after noticing and commenting upon the lack of harmony that formerly obtained in the decisions on this question, the authors say:

"While it is conceded that there is anything on the face of the paper which suggests a doubt as to the party bound, or the character in which any of the signers has acted in affixing his name, parol evidence is admissible between the original parties to establish the real intent, yet the view which obtained formerly with all courts, apparently, and still persists in some jurisdictions, deems instruments of the class herein considered not to show such an ambiguity as to warrant the introduction of extrinsic evidence. It is better in these cases, however, to hold that the signature is ambiguous, and hence subject to explanation by extrinsic evidence; and this is the modern view. According to sounder doctrine while, where one signs as agent of another, the *prima facie* presumption is that the words are merely *descriptio personae,* and, therefore, that the one so signing is personally bound; yet it may be shown in an action between the original parties that it was not so intended, and that, in fact, the real intention was to bind the principal whose name was disclosed in the signature of his agent, or who was well known by the payee to be the real party to be bound. Although the agent may have contracted in his own name, nevertheless, it is competent to show, by parol, the real facts, and that the contract was made on behalf of the principal, the agent not intending to assume any personal liability. All the facts and circumstances which took place at the time of the transaction may thus be shown. But the presumption exists in such case that the added designation is *descriptio personae,* and the right to show the fact to be otherwise is dependent upon the knowledge of the other party to the contract that such was the purpose when it was made."

While the Negotiable Instruments Act was not referred to by the authors of R. C. L. as affecting this rule, if our construction of it that, as between the original parties, it is but declaratory of the *prima facie* legal effect of the instrument, and we feel sure that this

is a correct and necessary construction, then the effect of the act, as between the original parties to an instrument, is to make extrinsic evidence of the intention of a party admissible to show that the real purpose in the execution of the instrument, especially where fraud or mistake is alleged as to its terms, even though prior to its enactment, such evidence would not have been admissible. But, however, that may be, such evidence was admissible in this state before the enactment of the statute; and, as between the parties, the act has not changed this rule. Clearly, therefore, the judgment should have been controlled, not by the terms of the note alone, but by the evidence as to the intention of appellees in executing it and of appellants in accepting it.

There is no contradiction of the evidence for appellees that, in executing the note, they did not intend to become personally liable therefor, but intended, as trustees of the church, to execute its note and to bind the church alone. As to appellants' intention in accepting the note, there is some difficulty. Mr. John Riordan, one of the appellants, who seems to have attended to this business for his firm, stated in his testimony the position of the firm in accepting the note in the following questions and answers:

"Q. When your firm accepted this note did it accept it as the note of the First Methodist Church, of Pikeville, Kentucky, or did it accept it as the note of the parties whose names appear on the note as makers? A. As the name of the parties. Q. I don't get the answer, Mr. Riordan. What is the answer? A. As the note of the parties. Q. Then state your answer clearly? A. As the note of the church parties. Q. Do you mean, Mr. Riordan, that you accepted this note as the note of the church or as the note of the parties whose names appear upon the note? A. As the note of the parties. Q. What was the nature of the debt for which this note was given? A. Bill of glass for the church. Bill of memorial windows. Q. Was that glass or those memorial windows furnished and delivered to the church by your firm? A. Yes."

This witness, however, in answer to a request to read from his books the original notation or entry made of one of the notes of which the note sued on was a renewal, introduced the following:

"Pikeville M. E. Church note due April 11th, extended thirty days to May 11th by notes dated May 1st,

at two months, with the trustees of the M. E. Church, Pikeville, Ky., A. O. Stump, J. K. Thornsbury, Perisa Fherigo, P. B. Stratton, J. A. Lewis."

From this, it will be seen that the note, for which the one sued on was given in renewal, was entered upon the firm's books as the note of the Pikeville M. E. Church.

This witness also introduced and filed with his evidence a rather extensive correspondence, had by the firm with Mr. Lewis, pastor of the church, with reference to this indebtedness and the several notes executed therefor. These letters are too numerous and lengthy to permit of their being copied into this opinion in full, and we will take extracts therefrom, which, it will be noticed, are hardly consonant with the witness' statement that the note was accepted by his firm as the individual obligation of the signers, rather than that of the church:

"March 31st, 1913. Your church note for $570.00 with 6% interest payable at First National Bank, of Pikeville, Ky., will be due April 11th, 1913. Please notify other parties on the note and oblige."

"May 14, 1913. In settlement of our art glass account with your church; we accepted your note dated Feb. 10th, for $570.00 with interest payable at the 1st National Bank, your city. When it came due, your pastor, Rev. Lewis, asked for an extension of 30 days on it, on account of not being able to dedicate it on time. . . . . We are writing this letter to all of the trustees of the church who went on this note . . . . . , and certainly regret that you have not given this obligation more attention than you have given."

"June 24, 1913. Your church note of $600.00 will be due at the First National Bank, Pikeville, on July 1st, and hope you will be prepared to meet it. "

"July 9, 1913. We were never so astonished in our lives as we were yesterday, when our bank called us up, saying your church note was returned. . . . . And the only way we see your way out of it, is to get your people to come together, and send us their check. They certainly can raise this little amount without waiting on the Church Extension Society to advance it."

"July 17, 1913. Will you please let us know what is the matter that the church note has not been attended? . . . . This is no way to do business; your church has the windows, and you know that they must be paid

for, so let us know by return mail what you intend to do.''

"Aug. 25, 1913. We got the enclosed today from our bank, and want to hear from you by return mail about it; our bank demands this money from us and we are in no condition to meet it, so it is up to your church to do something. When you gave us this note you said every one on it was a merchant except yourself and a lawyer, so they ought to be men enough to look after their paper and not have us have all this trouble.''

"Aug. 28, 1913. Since our bank notified us of the return of your note, we have written you twice about it, without getting an answer, and we are now writing you, registering our letter so that we will know you will get it, and want to hear from you by return mail what your church intends doing with this note.''

"Sept. 16, 1913. We wrote your people the other day to send us their check for $100.00 or $200.00, and their note for the balance, and we would see that our bank would carry it; now we will make this amount $100.00, and we want you to send us this right away, with a new note for the balance, signed by the trustees, then we will have the old note canceled, and returned to you together with the last one you sent us. Now there is no use saying you cannot do this; if you can make an effort we know you can, as certainly your people can raise this small amount. What became of the money you got for the memorial windows? No doubt you used this to pay other church debts, but this was not right as it should have been applied to the window account, and no other. We want you or some one to attend to this right away.''

"Oct. 18, 1913. We hope there will be no trouble in meeting the last church note you sent in to us, which falls due November 1st.''

The following letter was sent to Mr. P. B. Stratton, one of the trustees who signed the note sued on:

"Will you kindly let us know by return mail if you and friends will be able to meet the church note coming due November 1st? This note was sent in to us some time ago by Rev. J. A. Lewis, as a renewal on the old one.''

In the letters written by Mr. Lewis, he was asking indulgence from time to time until a loan of $2,500.00 could be negotiated by the church from the Church Extension Society which he said had been promised, and

out of which, when secured, he promised payment of the obligation to appellants.

In view of the fact that the note sued on is signed by the makers, with the word "trustee" added; and it was executed in settlement of an open account due by the church, of which they were trustees, and in response to the written request of appellants of the pastor of the church that he have a note for the indebtedness executed by the trustees; and in view of the quoted extracts from appellants' letters and of their entry upon their books of the note as the note of the church; and that there is no evidence whatever that the note was accepted by appellants as the individual obligations of the makers, except the statement of one of the appellants to that effect, made after suit had been filed, we would not be warranted in disturbing the finding of the chancellor upon the question of fact, that the note was not only executed by appellees as the note of the church, but that it was also accepted by appellants as the obligation of the church rather than that of the individual trustees. It is stated in the judgment that the defendants did not intend the note as their individual obligation, and from this it is argued by appellants that the court did not find that the mistake was mutual, but that it was only a mistake of the appellees alone. The court did recite in the judgment, however, that from the facts and circumstances, which we have stated in substance, the plaintiffs should not recover against defendants anything. This is, in effect, a holding that the mistake was mutual.

Judgment affirmed.