ROTHENBERG, J.
The plaintiff below, Bone & Joint Treatment Centers of America (“BJA”), appeals from the final judgment entered in its favor against defendant HealthTronics Surgical Services, Inc. (“HealthTronics”), and from the final judgment entered in favor of defendants HT Orthotripsy Management Company, LLC (“HTO”), a wholly-owned subsidiary of HealthTronics, and SanuWave, Inc. (“SanuWave”). Health-Tronics cross-appeals from the final judgment entered in favor of BJA. We reverse the final judgment entered in favor of BJA, and remand for entry of a final judgment in favor of HealthTronics, and affirm the final judgment entered in favor of HTO and SanuWave.
This appeal and cross-appeal stem from an agreement entered into between five entities following months of negotiations— HealthTronics; BJA, whose partners are Dr. Marvin Madorsky (“Dr. Madorsky”) and Dr. Richard Levitt; HTO; Miami Medical Management, Inc.; and Bone & Joint Center of South Florida, Ltd. (“Agreement”). One of the primary issues asserted in the cross-appeal relates to Paragraph 11 of the Agreement, which grants “tag along” rights to BJA in the event that “HTO accepts an offer to Dispose of all or substantially all of [its] interest” to a third party, but does not grant HealthTronics any tag along rights.
A few years after the five entities entered in the Agreement, HealthTronics entered into a purchase agreement with Sa-nuWave, whereby HealthTronics agreed to sell its entire orthotripsy division, which was held by its subsidiary HTO, to Sanu-Wave. Following the execution of the purchase agreement, BJA attempted to exercise the tag along rights set forth in Paragraph 11 of the Agreement. The transaction between HealthTronics and SanuWave closed without BJA exercising any tag along rights. Following the closing, BJA filed suit against HealthTronics, HTO, and SanuWave, asserting several causes of actions, including equitable reformation of the Agreement to include HealthTronics in the tag along provision set forth in Paragraph 11.
The predecessor judge, Judge Peter Adrien, bifurcated the reformation claim from the remaining claims asserted by BJA. During the bench trial, Judge Adrien heard evidence regarding the parties’ intent when entering into the Agreement and he reviewed several emails between HealthTronics’ counsel, Ted Biderman (“Mr. Biderman”), and BJA’s counsel, Marsha Madorsky (“Ms. Madorsky”), relating to the tag along provision. At the conclusion of the bench trial, Judge Adrien ruled that (1) due to the parties’ mutual mistake, HealthTronics was not named in the tag along provision, or (2) if there was no mutual mistake, there was a unilateral mistake on BJA’s part coupled with inequitable conduct on HealthTronics’ part. Specifically, Judge Adrien found that Mr. Biderman, HealthTronics’ counsel, assured Dr. Madorsky that HealthTronics would accommodate the request for a tag along provision, and in reliance, BJA relinquished its exclusive right to distribute the OssaTron machine and provide ortho-tripsy services in Florida. Judge Adrien also found that HealthTronics acted inequitably by structuring the sale to Sanu-Wave in a way that denied BJA of its tag along rights. In May 2010, Judge Adrien entered an order granting equitable reformation of the Agreement to add HealthTronics to the tag along provision, and ordering that a jury determine the tag along damages.
*366 At the conclusion of the six-day trial, the defendants moved for a directed verdict as to all counts, including equitable reformation. The trial court granted the motion as to several counts, but denied the motion as to equitable reformation. Therefore, the only issue remaining for the jury’s determination was the amount of tag along damages, if any. The jury awarded $278,996 to BJA against HealthTronics. Thereafter, the trial court entered final judgment in favor of BJA and against HealthTronics. The trial court also entered final judgment in favor of defendants SanuWave and HTO. This appeal[1] and cross-appeal followed.
In the cross-appeal, HealthTronics contends that the trial court erred by granting BJA’s claim for equitable reformation of the Agreement to add HealthTronics to the tag along provision. We agree.
Reformation of a contract is proper if the plaintiff establishes by clear and convincing evidence that the contract is the product of (1) the parties’ mutual mistake, or (2) a mistake on the part of one party coupled with the inequitable conduct on the part of the other party. See Providence Square Ass’n. v. Biancardi, 507 So.2d 1366, 1369, 1372 n. 3 (Fla.1987); Romo v. Amedex Ins. Co., 930 So.2d 643, 649 (Fla. 3d DCA 2006) (noting that reformation of a contract is proper if there is either a mutual mistake of the parties or a unilateral mistake by one party coupled with the inequitable conduct of the other party, and therefore, the written document fails to express the agreement of the parties).
The “clear and convincing” standard is “an intermediate standard of proof between the ‘preponderance of the evidence’ standard used in most civil cases, and the ‘beyond a reasonable doubt standard’ of criminal cases.” Morey v. Everbank, 93 So.3d 482, 489 n. 10 (Fla. 1st DCA 2012). The clear and convincing standard requires that the evidence “be of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established.” Id. (quoting Reid v. Estate of Sonder, 63 So.3d 7, 10 (Fla. 3d DCA 2011) (citations omitted)). An appellate court “may not overturn a trial court’s finding regarding the sufficiency of the evidence unless the finding is unsupported by record evidence, or as a matter of law, no one could reasonably find such evidence to be clear and convincing.” Morey, 93 So.3d at 489 (quoting Reid, 63 So.3d at 10).
In the instant case, the trial court granted the reformation of the Agreement finding that, based on a mutual mistake of the parties, HealthTronics was not included in the tag along provision or, in the alternative, if there was no mutual mistake, there was a unilateral mistake on the part of BJA coupled with the inequitable conduct of HealthTronics, namely Health-Tronics’ counsel, Mr. Biderman. A review of the record before this Court does not support the trial court’s finding that BJA established by clear and convincing evidence that there was either a mutual mistake by the parties or, in the alternative, a unilateral mistake by one party coupled with the inequitable conduct of the other party.
The record evidence demonstrates that prior to the execution of the Agreement in 2003, the parties to the Agreement were operating under several contracts/agreements relating to the OssaTron, a medical *367 device that treats orthopedic conditions using shock waves, and orthotripsy services utilizing the OssaTron. Over the years, the relationship between the parties deteriorated, and therefore, they met to address their future business relationship (“Blue Lagoon meeting”). BJA’s counsel, Ms. Madorsky, acknowledges that the tag along issue was not addressed at the Blue Lagoon meeting. Moreover, the first draft of the agreement that Mr. Biderman emailed to Ms. Madorsky on February 25, 2003, does not contain a tag along provision. Likewise, the revised drafts emailed by Mr. Biderman to Ms. Madorsky on March 17, 2003, and April 28, 2003, do not contain a tag along provision.
Tag along rights, however, were addressed in a May 8, 2003, email sent from Dr. Madorsky to BJA’s counsel, Ms. Ma-dorsky, which was then forwarded to Mr. Biderman. In relevant part, Dr. Mador-sky stated, “If [HealthTronics] sells their share of the partnership, BJA should have the option to sell their partnership share at the same terms of [HealthTronics].” On the following day, Friday, May 9, 2003, Mr. Biderman responded directly to Dr. Madorsky, stating: “Dr. Madorsky, these are all good points for which we can accommodate. ... I will revise to address your comments and return Wednesday [sic] when i[sie] am back in the office.” However, on Thursday, May 15, 2003, Mr. Bider-man emailed Ms. Madorsky, explaining that the revised draft did not include the requested “ ‘tag along[1] sale rights to BJA as the typical arrangement provides that [HealthTronics] syndicate its interest to physician investors and it does not make sense to try to syndicate a ‘profit interest’ at the same time.” Approximately thirty minutes later, Ms. Madorsky emailed Mr. Biderman, objecting to his failure to include the tag along provision, stating, in part: “I don’t quite understand what you mean about the tag along rights not being included. Why if [HealthTronics] is selling shouldn’t we be afforded the like rights whether profits interest or otherwise.... ” A few minutes later, Mr. Biderman responded to Ms. Madorsky’s email, stating, in part: “This agreement clearly states our agreement at our [Blue Lagoon] meeting and none of these issues were raised in our numerous prior drafts.” Mr. Bider-man also explained that a tag along provision is contrary to HealthTronics’ model.
On May 27, 2003, Ms. Madorsky sent a revised draft of the Agreement to Mr. Biderman that included two drafts of a tag along provision for Mr. Biderman’s consideration. Importantly, the two proposed drafts included tag along rights for BJA only as to HTO, not as to HealthTronics. Thereafter, on July 15, 2003, Ms. Mador-sky suggested additional language to be included in the tag along provision, but the additional language again did not add HealthTronics to the provision. Mr. Biderman agreed to include the additional language, and thereafter, on August 22, 2003, the parties executed the Agreement, which included the following tag along provision:
11. Capital Transaction. If HTO accepts an offer to Dispose of all or substantially all of their interests in the Florida Venture to a third party (the “Acquiror”), then (i) BJA shall have the right to require that the Acquiror acquire the interests of BJA at the same time and on the same terms as HTO interests are being acquired or HTO will be prohibited from Disposing of their interest; and (ii) HTO shall have the right to require that BJA Dispose of their interest to the Acquiror at the same time and on the same terms as the interests of BJA are being acquired. In addition, in the event of such a disposition, any part of the purchase price paid by an Acquiror that is attributable to *368 the rights to develop the territory in Florida or exclusivity in Florida for orthopedic treatment technology, services or procedures, HTO shall split such attributed purchased price equally with BJA (50% each).
Despite these emails, Ms. Madorsky testified that she believed that the tag along provision relating to HTO included a tag along provision for HealthTronics because it was her belief that HTO and Health-Tronics were essentially the same entity.
The trial court’s finding that BJA established by clear and convincing evidence a mutual mistake by the parties is not supported by the record. First, the Agreement identifies each of the five entities separately, including HealthTronics and HTO, and sets forth separate contractual obligations for each entity. Second, the Agreement included separate signatures lines for each of the five separate entities. Third, Ms. Madorsky acknowledged she was aware of the relationship between HTO and HealthTronics — HTO was a wholly-owned subsidiary of HealthTron-ics — but believed that they were one and the same. See Reynolds Am., Inc. v. Gero, 56 So.3d 117, 120 (Fla. 3d DCA 2011) (noting that a “parent corporation and its wholly-owned subsidiary are separate and distinct legal entities”) (quoting Am. Int'l. Grp., Inc. v. Cornerstone Bus., Inc., 872 So.2d 333, 336 (Fla. 2d DCA 2004)). Finally, the various emails indicate that Mr. Biderman did not waiver in his position that a tag along provision is contrary to HealthTronics’ model, and Mr. Biderman clearly informed BJA of HealthTronics position.[2]
Next, we address the trial court’s alternative finding that BJA established by clear and convincing evidence that there was a unilateral mistake on BJA’s part coupled with inequitable conduct by HealthTronics’ counsel, Mr. Biderman. The trial court’s finding of inequitable conduct was based on Mr. Biderman’s conduct leading up to the execution of the Agreement[3] and Mr. Biderman’s post-Agreement conduct — the manner in which the sale to SanuWave was structured.
In arguing that the trial court properly relied on Mr. Biderman’s post-Agreement conduct in finding inequitable conduct by HealthTronics, via Mr. Biderman, BJA relies on Resort of Indian Spring, Inc. v. Indian Spring Country Club, Inc., 747 So.2d 974 (Fla. 4th DCA 1999); Kolski v. Kolski 731 So.2d 169 (Fla. 3d DCA 1999); and Ayers v. Thompson, 536 So.2d 1151 (Fla. 1st DCA 1988). We conclude that BJA’s reliance on these cases is misplaced.
First, in Resort of Indian Spring, the issue was whether there was a mutual mistake, not whether there was a unilateral mistake coupled with inequitable conduct. Therefore, Resort of Indian Spring is inapplicable.
Next, in Kolski, the issue was whether the complaint stated a cause of action for *369 reformation. The complaint alleged that the plaintiff (appellant) loaned money to the defendant (appellee), and that the loan was payable on demand. Although the parties did not enter into a written agreement when the loan was made, the appellate court found that the parties’ subsequent writings were sufficient “to take the oral agreement out of the statute of frauds.” Kolski, 731 So.2d at 172. These subsequent writings, however, did not address whether the loan was payable upon demand, and the plaintiff sought reformation of these writings to include a payable on demand provision. This Court held that the trial court erred by dismissing the complaint because the allegations were sufficient to state a cause of action. The Kolski opinion did not address whether a party’s post-writing conduct could form the basis for a finding of inequitable conduct leading to the reformation of the agreement. Thus, Kolski is inapplicable.
Likewise, we conclude that BJA’s reliance on Ayers is misplaced. In Ayers, Mr. Thompson, the purchaser, and Mr. and Mrs. Ayers, the sellers, entered into a purchase and sale agreement. The property was “a portion of, and adjacent to property on which there is situated a restaurant and lounge owned and operated by” the Ayers. Ayers, 536 So.2d at 1152. During closing, the following language was inserted into the warranty deed: “Grantor reserves ten (10) feet along the southerly boundary for common access of both grantor and grantee.” After the transaction closed, Mr. Thompson constructed a building within ten feet of the property line and erected fences extending to the back of the property line. Thereafter, Mr. Ayers’ attorney wrote letters requesting that the fences be removed. Eventually, Mr. Ayers took matters into his own hands, and he had the fences removed.
After the fences were removed, Mr. Thompson filed suit against the Ayers, seeking, in part, the equitable reformation of the warranty deed to strike the easement provision. The parties disputed the circumstances concerning the insertion of the easement provision. Mr. Ayers’ testimony reflected that, in reviewing the survey, he realized that the property to be sold was actually closer to his building than he had anticipated, and thereafter, he informed the realtor that he intended to reduce the amount of land to be sold by ten feet. In response, the realtor suggested that instead of reducing the amount of land, there should be an easement. At closing, Mr. Ayers noticed that the easement provision had not been inserted into the warranty deed. After discussions, the closing agent was directed to insert the easement provision. Mr. Ayers further testified that he would not have signed the warranty deed if the provision had not been inserted.
In contrast, Mr. Thompson testified that he did not know that the closing agent had inserted the easement provision into the warranty deed. After he purchased the property, he constructed a building ten feet from the property line, and thereafter, he erected fences that extended to the back of the property line. Mr. Thompson also testified that he first learned of the easement when he received a letter from Mr. Ayers’ attorney, requesting that the fences be removed.
In the final judgment granting reformation, the trial court acknowledged that at closing, there was discussion regarding either the establishment of a ten-foot set back of the building or an easement to allow ingress and egress along the boundary line, however, “the buyer’s conduct made it clear that he did not intend to grant a ten-foot easement.” Id. at 1153.
*370 Mr. and Mrs. Ayers appealed. The First District Court of Appeal noted that “the trial court was required to resolve conflicting versions concerning not only the point at which the ten-foot reservation was inserted into the deed, but also the purpose of the reservation.” Id. at 1154. The First District concluded:
[T]he trial court’s finding that the subsequent conduct of Mr. Thompson demonstrated that there was no agreement between the parties regarding the grant of a ten-foot easement, is a reasonable interpretation of the evidence. Furthermore, implicit in this determination was the trial court’s finding that Mr. Ayers was guilty of inequitable conduct, thereby justifying the equitable remedy of reformation.
Id. at 1155.
Contrary to BJA’s assertion, the Ayers opinion does not stand for the proposition that the inequitable conduct supporting the reformation of a written conduct can occur after the writing was executed. The Ayers opinion merely points out that Mr. Thompson’s post-writing conduct demonstrates that he did not know that a certain provision had been inserted into the writing, and therefore, implicitly found that Mr. Ayers was guilty of inequitable conduct. The inequitable conduct was Mr. Ayers’ involvement in, or knowledge of, the insertion of the easement provision in the warranty deed without Mr. Thompson’s knowledge. The warranty deed, therefore, failed to express the agreement of the parties.
In the instant case, there was no inequitable conduct by HealthTronics’ counsel, Mr. Biderman, leading to the execution of the Agreement. Throughout the negotiations, Mr. Biderman informed BJA that a tag along provision relating to Health-Tronics would not be included in the Agreement. Finally, after months of negotiations, Ms. Madorsky, BJA’s counsel, drafted two proposed tag along provision as to HTO, not HealthTronics, and requested that Mr. Biderman agree to include one of the provisions in the final Agreement. At Ms. Madorskys request, Mr. Biderman chose one of the two provisions, which was ultimately inserted into the Agreement. Therefore, unlike Ayers, in the instant case, the party seeking reformation, BJA, knew the provision was being inserted into the Agreement and had itself proposed the specific language of the provision.
As we conclude that the record evidence does not support the trial court’s finding that BJA established by clear and convincing evidence that there was either a mutual mistake by the parties or a unilateral mistake by one party coupled with the inequitable conduct of the other party, we reverse the order granting reformation of the Agreement. The remaining issue raised by HealthTronics in its cross-appeal is rendered moot as a result of the reversal of the order granting reformation, and the remaining issues raised by BJA in its appeal lack merit. Accordingly, we reverse the final order entered in favor of BJA, and remand with directions to enter final judgment in favor of HealthTronics, and affirm the final judgment entered in favor of HTO and SanuWave.
Affirmed, in part; reversed, in part, and remanded with directions.

. BJA named SanuWave as an appellee, but did not challenge the final judgment entered in favor of SanuWave. See Fla. R.App. P. 9.020(g)(2) (defining "appellee” as "[ejvery party in the proceeding in the lower tribunal other than an appellant”).

. On May 8, 2003, Dr. Madorsky emailed Ms. Madorsky, regarding the inclusion of a tag along provision as to HealthTronics, which email was forwarded to Mr. Biderman. Mr. Biderman responded the following day, stating that Dr. Madorsky's request could be accommodated. However, within a few days, Mr. Biderman clarified his position, explaining that the attached revised draft did not include the requested " 'tag along' sale rights.” Thus, this cannot form the basis for the trial court’s finding of a mutual mistake as Mr. Biderman’s position was made clear pri- or to the execution of the Agreement.

. The trial court could not have found any inequitable conduct by Mr. Biderman leading up to the execution of the Agreement. As previously addressed in this opinion, Mr. Biderman was forthright with Ms. Madorsky that HealthTronics objected to any tag along provision.